UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LYNN ROGERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 14 C 4029 |
| | ) | |
| RELIANCE STANDARD LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

This matter comes before the Court on the cross-motions for summary judgment of Plaintiff Lynn Rogers ("Rogers") and Defendant Reliance Standard Life Insurance Company ("Reliance"), both pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). For the following reasons, the Court denies the cross-motions for summary judgment and remands the case for further proceedings consistent with this Memorandum Opinion.

## BACKGROUND

**I. Facts**

### A. Parties

Rogers is a resident of Oakbrook Terrace, Illinois. Rogers worked as a Neiman Marcus sales associate prior to leaving her employment on January 24, 2011,

generating $28,763.52 in annual salary and $45,917.55 in commissions during a twelve month timespan. Reliance is an insurance company, licensed to do business in Illinois and was, at all times relevant hereto, doing business throughout the United States and within the Northern District of Illinois.

**B. The Policy**

Pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(3) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"), Rogers seeks continued long term disability ("LTD") benefits under an employee welfare benefit plan, afforded by The Neiman Marcus Group, Inc. ("Neiman Marcus") to its eligible employees. Neiman Marcus's Long Term Disability Plan ("Plan") is insured by Group Policy No. LTD 668451 (the "Policy") issued by Reliance. The Plan is governed by ERISA and Reliance is the fiduciary of the Plan.

On August 1, 2010, the Policy for Rogers, and issued by Reliance on December 27, 2010, became effective. The Policy contains an insurance clause:

> **INSURING CLAUSE:** We will pay a Monthly Benefit if an Insured:
> (1) Is Totally Disabled as a result of a Sickness of Injury covered by this Policy;
> (2) Is under the regular care of a Physician;
> (3) Has completed the Elimination Period; and
> (4) Submits satisfactory proof of Total Disability to us.

The Policy provides for the termination of the monthly benefit as follows:

> **TERMINATION OF MONTHLY BENEFIT**: The Monthly Benefit will stop on the earliest of:
> (1) the date the Insured ceases to be Totally Disabled;
> (2) the date the Insured dies;

(3) the Maximum Duration of Benefits, as shown on the Schedule of Benefits page, has ended; or

(4) the date the Insured fails to furnish the required proof of Total Disability.

The Policy contains the following provision:

**PHYSICAL EXAMINATION AND AUTOPSY:** We will, at our expense, have the right to have a Claimant interviewed and/or examined:

(1) physically;

(2) psychologically; and/or

(3) psychiatrically;

to determine the existence of any Total Disability which is the basis for a claim. This right may be used as often as it is reasonably required while a claim is pending.

The Policy specifies the payment of claims:

**PAYMENT OF CLAIMS:** When we receive written proof of Total Disability covered by this Policy, we will pay any benefits due. Benefits that provide for periodic payment will be paid for each period as we become liable.

Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all the parties.

The Policy defines Totally Disabled and Total Disability, as a result of an Injury or Sickness, as:

(1) During the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation;

(a) "Partially Disabled" and "Partial Disability" mean that as a result of an injury or Sickness an Insured is capable of performing the material duties of his/her Regular Occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;

(b) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and

(2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of Any Occupation. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

"Elimination Period" means:

[A] period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable.  It begins on the first day of Total Disability.

"Regular Occupation" means:

[T]he occupation the Insured is routinely performing when Total Disability begins.  [Reliance] will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale.

"Any Occupation" means:

[A]n occupation normally performed in the national economy for which an Insured is reasonably suited based upon his/her education, training or experience.

**C. Rogers' Disability**

Since February 2008, Rogers received treatment for a plantar nerve lesion on multiple occasions.  Dr. Lee Simeone ("Dr. Simeone") is her treating podiatrist.  On July 29, 2010, Rogers saw Dr. Simeone, who noted that "Pt. does have sig. arthritic changes and would consider dis-ability."  On December 29, 2010, Rogers saw Dr. Simeone for a follow up on bilateral foot pain, right worse than left, stating that her

toes felt like they were burning.  Dr. Simeone authored a letter stating that Rogers should be off work that day.  In a letter dated January 3, 2011, Dr. Simeone wrote that Rogers "will be on short-term disability until further notice" and that he "will re-evaluate her in two weeks."  On January 13, 2011, Rogers was again examined by Dr. Simeone, who opined that "[a]ll conservative treatment has failed" and that Rogers "will file [for] disability and then consider surgery not to correct the problem but to relieve some pain."  That same day, Dr. Simeone wrote a doctor's note on behalf of Rogers, stating that as of January 23, 2011, Rogers would be off of work for pre-surgical care.  On February 8, 2011, Rogers returned to Dr. Simeone, where he stated "Pt. is really unable to bear weight for any extended time. Discussed with pt. remaining non weight bearing."  On February 21, 2011, Rogers was examined by Dr. Ronald Cheff ("Dr. Cheff"), her primary internist.  Dr. Cheff diagnosed her with chronic pain in her feet.  On February 28, 2011, Rogers returned to Dr. Simeone, reporting new hip and lower back pain and cramping.  After x-rays of Rogers' right foot were taken and a follow-up examination was completed on March 21, 2011, Dr. Simeone noted that a calcaneal (heel) spur had developed due to Rogers' inability to bear weight on the front of her foot.  On April 18, 2011, Rogers had a follow-up visit with Dr. Simeone, where he noted that Rogers was still in pain, which he classified as moderate to severe neuritis neuralgia.  Dr. Simeone stated in his Comments section that Rogers "will be unable to return to [her] current job.  After clinical exams today

and from pre[vious] visits, she is unable to stand for more than 1 hour.  Surgery is not an option.  The [patient] is perm[antly] incapacitated."

On May 6, 2011, Dr. Simeone completed Matrix Absence Management, Inc.'s Health Care Provider Certification (disability questionnaire) on Rogers' behalf, indicating that she is "incapacitated from all work," that she is "permanently disabled," that she "will not be able to return to work," and that she may work "0" hours each day.  Reliance denies that Dr. Simeone completed the disability questionnaire.  Dr. Simeone indicated under "Work Restrictions" that Rogers could lift, push and pull "1-11lbs," could bend and stoop "0%-6%" of the day, that she could not climb, that she could not complete competitive work, and that she had no restriction in sitting.  On May 17, 2011, Dr. Simeone completed an Attending Physician's Statement on Rogers' behalf, indicating that her primary diagnosis was plantar nerve lesion, mononeuritis and calcaneal spur.  Rogers' restrictions included that she could stand, sit, walk and drive from 1-3 hours each in an 8-hour day.  Dr. Simeone also indicated that Rogers was capable of sedentary work activity with additional restrictions of limiting 5-10 pounds and that she could use her upper extremities for simple grasping and fine manipulation.  Rogers was able to bend or squat only minimally.  Under "Prognosis for Recovery," Dr. Simeone noted that Rogers was "permanently disabled."  On May 24, 2011, Rogers went to another doctor, reporting ongoing difficulty bending and walking due to her bilateral knee pain with some recent improvement.

On June 1, 2011, Reliance completed a Designation of Occupation report where Rogers was designated as a sales clerk. The position of a sales clerk is considered "light" in terms of strength necessary, and requires:

> lifting, carrying, pushing, pulling 20 Lbs. occasionally, frequently up to 10 Lbs., or negligible amount constantly. Can include walking and standing frequently even though weight is negligible. Can include pushing and or pulling of arm and or leg controls.

The position required standing and walking all day throughout the Men's Department, assisting and fitting customers in different types of clothing, running a cash register, keeping sales records and interfacing with customers on a routine basis. Rogers stated that she would have to lift boxes of merchandise weighing 25 pounds frequently and weighing up to 50 pounds on an occasional basis. Throughout the remainder of 2011, Rogers frequently visited doctors for her pain.

On June 26, 2011, a nurse case manager from Reliance indicated that Rogers has failed aggressive conservative treatment and does not want to undergo surgical intervention. The nurse case manager also stated that the clinical evaluation and assessment by Dr. Simeone were consistent with the restrictions and limitations provided of ability to lift 5-10 lbs. due to altered gait and knee pain. The nurse case manager also agreed with Dr. Simeone's assessment that she would not expect improvement without surgical intervention. There is also another case manager who assessed Rogers' claim, stating that:

> medical review indicates restrictions and limitations that are not consistent with sedentary work capacity. Vocational potential appears limited. Monitor

medical progress. If updated medicals support work function and claimant does not return to regular occupation, consider referral for vocational review.

On July 5, 2011, Rogers received a letter from Reliance informing her that her claim for LTD benefits under the Policy had been approved. On July 23, 2011, Reliance made its initial determination of total disability and told Rogers that during the first 24 months her LTD benefits were payable by only showing that she was disabled from performing the material duties of her regular occupation. On May 8, 2012, Rogers was approved to receive Social Security Disability Insurance ("SSDI") benefits.[1] Based on the salary Rogers was receiving prior to the onset of her disability, Rogers' monthly gross benefit was $3,111.71, which was reduced to $2,247.71 as of July 2011 as a result of her award of social security disability insurance ("SSDI") benefits in the monthly amount of $864.00. SSDI benefits were officially approved on May 8, 2012 and those benefits continue to this day. On May 15, 2012, Rogers was sent a Notice of Award, stating that she was to receive $6502.50 in past-due benefits for the period of July 2011 through April 2012.

On January 30, 2013, Dr. Simeone noted that Rogers would most likely have residual pain and neuritis even after surgery, although surgery would reduce her pain in intensity. On February 21, 2013, Reliance conducted its medical review based on updated medical records, finding that the clinical information supported less than a sedentary level of function due to right lower extremity pain and pain from lumbar

---

[1] Throughout 2012 and 2013, Rogers frequently visited doctors. It is unnecessary for the Court to expound on specific medical evidence in the record.

spine due to fractured disc.  Reliance noted that surgery may be necessary in the

future.  On July 5, 2013, a spinal surgeon, Dr. Richard D. Lim ("Dr. Lim") and

physician assistant, Michael Meeker ("Meeker"), evaluated Rogers.  Dr. Lim noted

that Rogers complained of lower back pain that occasionally radiated into the right leg

and knee for the past 2-3 years.  Rogers had normal findings upon physical

examination of her spine with normal alignment with no deformities.  Rogers' spine

was tender to palpation in the lower lumbar area.  Otherwise, the physical

examination of her spine was normal.  Rogers also demonstrated normal range of

motion in her hips, knees and ankles, good strength and tone and normal reciprocal

heel toe gait with a normal stance.  The radiographs revealed that Rogers' lumbar

spine had significant disk space narrowing and Dr. Lim diagnosed her with

degenerative disc disease in L4-5, L5-S1.  Rogers' recommendation was further

treatment and MRIs.

On July 19, 2013, Rogers was examined by Dr. Lim and in the History portion

of her medical records, Dr. Lim wrote:

> "Presents today for followup. She had her MRI. Continues to mostly have back
> pain. She states she can walk all day without a significant amount of pain. The
> pain starts whenever she stops and occasionally has pain down the right leg
> with activities as well."

During this appointment, Dr. Lim also reviewed Rogers' MRI and found that she had

some mild stenosis at L4-5, L5-S1 and had Modic changes at those levels and mild

disc desiccation in L3-4.  Dr. Lim's assessment and plan was as follows:

"I had a long discussion with her regarding her treatment options. She has been through therapy and extensive injections in the past all of which have stopped helping. She was given the option of surgical intervention, decompression, posterior spinal fusion L4-5, L5-S1, possibly L3-4 as well given her desiccation, but again she has no disc space narrowing or Modic changes at that level. For now, she will continue to live with her symptoms as tolerated and follow up with us every 12-18 months for reevaluation.

On July 23, 2013, Rogers was examined by her primary care physician, Dr. Asma Ayub ("Dr. Ayub"). According to the medical records, Dr. Ayub wrote that Rogers reported that she is able to exercise, go down stairs, perform activities of daily living, walk, walk 10 blocks and walk 5 to 10 blocks. She also reported that she is not able to go upstairs, kneel and walk an unlimited distance. She finds it difficult to climb stairs, get in and out of car, and put on socks and shoes.

Also on July 23, 2013, Reliance notified Rogers that based on their review of her medical records, that she was capable of performing sedentary work and that she would no longer be entitled to LTD benefits beyond September 23, 2013. The parties dispute whether after July 23, 2013, Rogers needed to satisfy a stricter definition of Total Disability to quality for further benefits or if she could qualify based on being unable to perform the material duties of any occupation normally performed in the national economy for which she is reasonably suited.

On August 23, 2013, Reliance's nurse case manager opined that "[s]edentary restrictions and limitations with the ability to stand and stretch are supported ongoing through 9/1/14." On August 27, 2013, a Reliance employee concluded that based

upon the restrictions and limitations determined by the nurse case manager, Rogers had the requisite physical and vocational capacity to perform sedentary occupations like: (i) telephone sales representative; (ii) order clerk, food and beverage; (iii) information clerk; (iv) check cashier; and (v) food checker.

A bilateral foot x-ray from September 5, 2013 showed good bone mineralization and an absence of localized soft tissue swelling in either foot. Rogers demonstrated some mild degenerative narrowing at the first metatarsal-phalangeal joints bilaterally and a right plantar calcaneal spur. No acute osseous abnormality was identified in either foot. Immediately prior to her bilateral foot x-rays, Rogers reported to Dr. Simeone that her foot pain had become so severe that she had been unable to sleep for two days.

On October 1, 2013, Reliance terminated Rogers' claim for ongoing LTD benefits because it had determined that Rogers was not disabled under the "Any Occupation" standard of disability. Reliance explained that it had determined that Rogers was capable of sedentary work activity and had identified sedentary occupations that she was qualified to perform. Reliance states that the Social Security Administration's favorable determination is "not binding on [Reliance]'s decision as to whether or not [Rogers] meet[s] the definition of 'Total Disability' as set forth in [her] Policy."

On October 14, 2013, Dr. Ayub wrote a letter, diagnosing Rogers with lumbosacral neuritis, plantar fibromatosis, calcaneal spurs, mononeuritis of the legs,

hypertension and migraine headaches. Dr. Ayub stated that she believed that Rogers suffered from chronic pain in both feet, both knees and the lumbar spine, including difficulty in completing normal daily activities. Dr. Ayub noted that Rogers' ambulation was impaired and that she could not walk or stand for more than ten to fifteen minutes at a time. Sitting was also painful for Rogers as she had to change positions every ten to fifteen minutes. Dr. Ayub contended that Rogers also required assistance with transportation. Dr. Ayub further opined that such findings were "permanent and will progressively get worse." In her clinical opinion, Dr. Ayub found that Rogers "was unable to work standing or sedentary" and thus, "incapable of gainful employment."

On October 18, 2013, Dr. Simeone wrote his own letter, determining that it would be best not to perform any surgical procedure on Rogers because it would not alleviate any of the chronic permanent pain in Rogers' lower back and lower extremity. Throughout the remainder of 2013, Rogers visited her doctors on multiple occasions, complaining of pain. On December 11, 2013, Meeker completed a lumbar spine residual functional capacity questionnaire and indicated that Rogers' conditions would "constantly" interfere with attention and concentration and she would likely be absent from work more than four days per month. However, another form dated on December 9, 2013 or December 11, 2013, states that Rogers' conditions would rarely interfere with her attention and concentration.

**D. Rogers' Appeal**

For reference, the ERISA regulations set out a specific time frame for deciding an appeal. 29 C.F.R. § 2560.503-1(i)(3)(i) provides 45 days for the administrator to make a determination on a review, and provides one 45-day extension of time if needed. 29 C.F.R. § 2560.503-1(i)(4) provides that the clock begins to run when the appeal is filed, "without regard to whether all the information necessary to make a benefit determination on review accompanies the filing."

On October 22, 2013, Rogers, through counsel, indicated her intent to appeal. On November 21, 2013, Reliance clarified that Rogers' October 22, 2013 letter was not a letter of appeal and that any appeal had to be received within 180 days of the original denial letter. On March 28, 2014, Reliance received Rogers' appeal submission in the mail. Rogers disputes this date. The date on the front page of the letter is March 24, 2014, but the subsequent pages have the date of March 11, 2014. Rogers claims the letter was not placed into the mail until March 26, 2014, but agrees that it did not arrive at Reliance's office until March 28, 2014.

In Rogers' appeal, she asserts five arguments: (i) that Reliance's belief that surgery would be curative was erroneous; (ii) Reliance's determination that she could complete full-time sedentary work was against the manifest weight of the medical evidence was incorrect; (iii) Reliance should have considered and given weight to the Social Security Administration's determination; (iv) Reliance failed to consider additional disabling impairments, including depression and anxiety, detailed in the

medical record; and (v) Rogers disputed Reliance's vocational assessment, stating that she was not qualified for any of the positions cited in the termination letter and that the vocational assessment performed by the Social Security Administration bore out that truth.

On May 1, 2014, a Reliance employee noted in her file that she recommended a peer review of Rogers' records. On May 9, 2014, Reliance sent Rogers a letter requesting an independent medical evaluation ("IME") and told Rogers that the IME request tolled the time for reaching an appeal determination. On May 9, 2014, Reliance also referred Rogers to a doctor to perform the IME. Rogers claims that it was not until May 14, 2014 that she found out about Reliance's request for an IME when an employee called her counsel's office. On May 14, 2014, Rogers was informed that an IME was scheduled with Dr. Dinora Ingberman, a physical medicine and rehabilitation specialist in Skokie, Illinois. On May 15, 2014, Rogers' counsel sent Reliance a letter, objecting to the IME because the time for deciding the appeal had already passed, and the Policy only gave Reliance the right to have Rogers examined when she submitted her claim and while she was receiving her benefits. On May 20, 2014, Reliance responded to Rogers' objection, stating that the letter requiring the IME was sent on May 9, 2014, less than 45 days after receipt of the appeal on March 28, 2014. Reliance explained that the 45th day was May 12, 2014 and expressed its expectation that Rogers would attend the scheduled IME on June 10, 2014. Rogers denies that she received the May 9, 2014 letter and Reliance failed to

fax it or sent it by means that guaranteed its prompt receipt. On May 21, 2014, Rogers' counsel responded, reiterating Rogers' objection to the untimely request for an IME, and requested that Reliance immediately render a full and fair determination based on the evidence contained in Rogers' appeal letter. In a letter dated May 22, 2014, Reliance informed Rogers' counsel that failure to respond by the end of that day's business would be construed as a refusal to attend the IME. Reliance also offered Rogers' counsel the ability to reschedule the IME with a different physician. Rogers did not respond to Reliance's May 22, 2014 letter. Reliance upheld its previous termination of Rogers' benefits based on the determination that an IME is necessary to assess Rogers' restrictions and limitations, and in the absence of an IME, Rogers is capable of performing sedentary work. Reliance reiterated that the Social Security's determination and process for assessing disability are not binding on Reliance' s decision for determining whether or not Rogers meets the definition of "Total Disability" as set forth in the Policy. The May 23, 2014 letter also states that Reliance's claim decision is final, but that since Rogers' claim was denied for failure to cooperate under the Physical Examination and Autopsy provision of the Policy that she may request a review specific only to the IME portion of Reliance's determination. Rogers did not submit an appeal and filed the instant lawsuit on May 30, 2014.

It is noteworthy that Rogers was never evaluated by a doctor or independent medical professional that was affiliated with Reliance and Rogers has never seen a specific doctor at Reliance's request.

## II. Procedural History

On May 30, 2014, Rogers filed her complaint against Reliance and seeks to recover: (i) disability benefits due to her under a group policy of long term disability ("LTD"); (ii) attorneys' fees pursuant to 29 U.S.C. § 1132(g); and equitable relief pursuant to ERISA § 502(a)(3) (29 U.S.C. § 1132(a)(3)). On January 9, 2015, Rogers and Reliance filed the instant cross-motions for summary judgment pursuant to Rule 56.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery, disclosures, and affidavits establish that there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on which the movant bears the burden of proof at trial. *Id.* at 325. The non-movant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with documentary evidence. *Id.* A genuine issue of material fact exists when, based

on the evidence, a reasonable jury could find in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing cross-motions for summary judgment, the Court views all facts and draws all reasonable inferences in a light most favorable to the party against whom the motion is made. *Gazarkiewicz v. Town of Kingsford Heights, Ind.*, 359 F.3d 933, 939 (7th Cir. 2004).

## DISCUSSION

### I. Standard of Review

ERISA provides that a participant in, or beneficiary of, a covered plan may sue "to recover benefits due to him under the terms of [the] plan, to enforce [her] rights under the terms of the plan, or to clarify [the] plan, to enforce [her] rights under the terms of the plan, or to clarify [the] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has held that courts should apply a *de novo* standard—instead of the more deferential arbitrary and capricious standard—to a benefits determination under ERISA "unless the plan provides to the contrary." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321 (7th Cir. 2007). A plan provides to the contrary when it grants its "administrator or fiduciary discretionary authority to determine eligibility for benefits." *Id.* (internal citation omitted). Under those circumstances, "[t]rust principles make a deferential standard of review appropriate." *Firestone*, 489 U.S. at 111. The arbitrary and capricious standard is "the least demanding form of judicial

review of administrative action, and any questions of judgment are left up to the administrator of the plan." *Trombetta v. Cragin Fed. Bank for Savings Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996). "To constitute a full and fair review under 29 U.S.C. § 1133(2), all the evidence that [Rogers] submitted should have been considered by [Reliance]." *Semien v. Life Ins. Co. of N.A.*, 436 F.3d 805, 812 (7th Cir. 2006) (parenthetical omitted). With respect to a summary judgment motion, a court must determine the reasonableness of the plan administrator while drawing all inferences in favor of the claimant. *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 992 (N.D. Ill. 2003).

Rogers argues that the Court should review the denial of her benefits *de novo*, whereas Reliance finds that the Court should use the arbitrary and capricious standard of relief. The Policy was issued on December 27, 2010, but became effective on August 1, 2010, and contains an "Anniversary Date" of August 1, 2011 and each August 1st thereafter. It specifically provides:

> Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all the parties.

The Policy also *expressly* states it is delivered in Texas and subject to Texas laws and regulations. Typically, the inclusion of a discretionary clause would end the inquiry of what standard to apply, and we would review using the arbitrary and capricious standard. However, the parties do not agree on the standard of review

because of state administrative regulations, which Rogers claims invalidate the above-mentioned discretionary clause.  Rogers contends that Section 2001.3 of Title 50 of the Illinois Administrative Code ("Section 2001.3") (effective July 15, 2005) and the Texas equivalent, 28 TAC §§ 3.1201-3.1203 (the "Texas Regulations") (effective Dec. 23, 2010), both of which prohibit discretionary clauses in insurance contracts and related documents, strip the plan of its discretion-conferring language and triggers *de novo* review.  Specifically arguing the applicability of Section 2001.3, Rogers claims that since she was hired in Illinois, became insured under the Policy while working and living in Illinois, and received notice of benefit termination while living in Illinois, Illinois's Section 2001.3 should apply over the Texas Regulations.  The Court disagrees.  On its face, the Policy explicitly states that the Texas Regulations apply based on the policy holder and insured in this matter, The Neiman Marcus Group, Inc.'s principal executive offices being located in Texas.  This is different than *Curtis v. Hartford Life and Acc. Ins. Co.*, No. 11 C 2448, 2012 WL 138608, at *2 (N.D. Ill. Jan. 18, 2012), where the court found that applying Delaware law, which allowed discretionary clauses, was contrary to Section 2001.3 "and the public policy of Illinois," because the only Delaware connection was that the policy was delivered to a trust in Delaware.  Thus, the Texas Regulations apply and it is unwarranted for us to engage in a conflict of law or public policy analysis when the Texas Regulations squarely comply with the parties' written intentions as of August 1, 2010.

Because the Texas Regulations apply to policies that renew at any time beyond February 1, 2011, and are not retroactive, the discretionary clause embedded in the Policy stands. Unlike Rogers' contention, the Court does not find that the Policy renews every August 1st to include any new regulations not imposed on, or before the August 1, 2010 date that the Policy became effective, simply because the Policy mentions an "Anniversary Date." The Court finds that the Policy lacks any specific language referring to an annual renewal and no evidence exists showing the parties agreed to material or significant changes to the Policy between August 1, 2010 to the present. The discretionary clause is, therefore, valid. It is unnecessary to decide whether either regulation is preempted by ERISA because the Policy permits Reliance to utilize a discretionary standard, and no exception applies to such.

## II. The Decision to Deny Benefits Was Arbitrary and Capricious

Under the highly deferential arbitrary and capricious standard, courts "will overturn a plan administrator's decision 'only ... if it is downright unreasonable.' " *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007) (quoting *Herman v. Cent. States, Se. & Sw. Areas Pension Fund*, 423 F.3d 684, 692 (7th Cir. 2005)). The Court will not substitute the conclusion it would have reached for the decision of the plan administrator "as long as the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts." *Id.* "Despite the deferential nature of this standard however, it 'is not a rubber stamp' and a denial of benefits will not be upheld 'when there is an absence of reasoning in the

record to support it.' " *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321 (7th Cir. 2007) (citing *Hackett v. Xerox Corp. Long–Term Disability Income*, 315 F.3d 771, 773 (7th Cir. 2003)). This Court will uphold Reliance's determination "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Id.* at 321–22 (quoting *Sisto v. Ameritech Sickness & Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005)).

ERISA provides that insurers may, but are not required to, seek out independent medical evaluations. *Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003). Seeking independent expert advice is evidence of a thorough investigation, and reliance upon independent experts generally insulates the fiduciary from judicial reversal. *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998). The reason that Reliance terminated Rogers' claim is only because she did not submit to its requested IME. Rogers argues that she was not made known of the IME request until May 14, 2014, which is after the May 12, 2014 expiration of the 45 day review period Reliance is allotted. Reliance responds, stating that it sent Rogers a letter requiring an IME dated May 9, 2014, which is less than 45 days after the receipt of Rogers' appeal.

The Court does not find that Reliance's decision to uphold its denial based on a timing issue regarding receipt of one letter to be a full and fair assessment of Rogers' claim.  Likewise, the Court refuses to disclaim Rogers' disability benefits based on such a procedural issue.  This is not strictly a case of unreasonable delay on the part of Reliance in requesting the IME; Reliance may reasonably need additional physical examinations to fully consider the relevant factors that encompass Rogers' disability. Rogers' outright refusal to participate in the IME was based on the confusion surrounding the timing of the request, which is quite different from other cases involving claimants refusing to participate in IMEs for separate, personal reasons.  In light of the extensive medical record, we are confident that an IME would help us make a more just decision and allow Reliance to conduct a full and fair assessment of Rogers' disability[2].

Rogers' argument that Reliance's request for an IME during the appeal process was impermissible because the Policy only allows Reliance to request an IME "while a claim is pending" does not resonate well with this Court.  We find that the administrative appeal process is still considered part of the pending claim.  This is especially true since Reliance both evaluates and pays the claim.  We acknowledge that Rogers refused to participate in the requested IMEs and filed the instant lawsuit quickly after Reliance upheld its denial.  Nevertheless, Rogers had the ability to do so,

---

[2] In many cases cited by both parties, some of which involve Reliance as the defendant, an IME had already been conducted before the court assessed the fairness of the denial.

based on the language in the Policy.  We also understand that as a consequence of

Rogers' choice to file suit, Reliance had to officially terminate her benefits, finding

that it made a full and fair determination since Rogers refused to participate in the

IME.  However, the absence of an IME coincides with an "absence of reasoning" on

Reliance's part, making Reliance's decision to deny Rogers' benefits arbitrary and

capricious.  *See Harper v. Reliance Standard Life Ins. Co.*, 07 C 3508, 2008 WL

2003175, at *9 (N.D. Ill. May 8, 2008) (where the court found that Reliance's

decision to deny claimant's appeal for failure to undergo an IME was arbitrary and

capricious, remanding the case for a new review of eligibility).  The court's decision

in *Harper* to grant summary judgment in favor of the claimant is distinguishable from

our decision to presently deny Rogers' motion for summary judgment because the

deadline to decide the appeal in *Harper* expired at the end of February, but it was not

until April that Reliance requested an IME.  Here, we are dealing with much more of a

close-call—a matter of days—and we currently lack the requisite information to grant

Rogers the specified relief she requests.

Additionally, the Court refuses to accept Rogers' argument pertaining to

Reliance's conflict of interest as a plan administrator that both evaluates claims for

benefits and pays benefits claims.  A conflict of interest is only one factor in assessing

abuse of discretion and "nearly all insurance companies fit that description."  *See*

*Shepherd v. Life Ins. Co. of N. Am.*, No. 11 C 3846, 2012 WL 379775, at *3 (N.D. Ill.

Feb. 3, 2012).  The Court also finds that Reliance's contention that Rogers has failed

to exhaust her administrative remedies unpersuasive.  In the Policy, the only

requirement for exhaustion of remedies is found within the rule for arbitration of

claims.  The Policy specifically provides that, "[i]n the case of a claim under

[ERISA], the Insured's ERISA claim appeal remedies, if applicable, must be

exhausted before the claim may be submitted to arbitration."  There is nothing else in

the Policy, including under the "LEGAL ACTIONS" section that discusses

administrative remedies.  After combing through the Policy, and in the absence of

specified language compelling exhaustion, the Court does not find that Rogers is

required to have exhausted administrative remedies before filing suit.  *See* 29 C.F.R. §

2560.503– 1(l) ("a claimant shall be deemed to have exhausted the administrative

remedies available under the plan and shall be entitled to pursue any available

remedies under section 502(a)....").

    Accordingly, an IME would assist the Court in determining whether Reliance

made a full and fair assessment of Rogers' claim.  Although Reliance is not required

to seek out an IME, it has clearly requested the need for one.  The Court orders the

parties to proceed with the IME, which is to be conducted within a practicable time

frame.  The parties are to also agree on the physician who will conduct the IME.

Therefore, at the present posture, the appropriate course in this case is to remand

Rogers' claim so Reliance can conduct a new review of her eligibility with the inclusion of the resulting IME.

## CONCLUSION

For the aforementioned reasons, the cross-motions for summary judgment are presently denied.  The Court remands the case to Reliance to review Rogers' claim for benefits again.


_____
　　　Charles P. Kocoras
　　　United States District Judge

Dated:  5/6/2015